```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                                                            :         **MEMORANDUM AND ORDER**
                      -against-                             :              10-CR-968 (DLI)
                                                            :
BRAD A. RUSSELL, et al.,                                    :
                                                            :
                              Defendants.                   :
                                                            :
----------------------------------------------------------- x
```

**DORA L. IRIZARRY, U.S. District Judge:**

The Superseding Indictment ("Indictment") filed in this matter charges Defendant Brad Russell ("Defendant") and others with securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud. (Docket Entry No. 38.) Defendant moved to dismiss the Indictment, or alternatively, to suppress his grand jury testimony pursuant to Federal Rule of Criminal Procedure 12(b), the Fifth Amendment to the U.S. Constitution, and the court's supervisory powers. (Mem. of Law in Supp. of Pre-Trial Motions for Brad A. Russell ("Def. Mem."), Docket Entry No. 89-2; Decl. of James M. Branden ("Branden Decl."), Docket Entry No. 106.) The government opposes the motion. (Gov't Mem. of Law in Response to Def.'s Pre-Trial Motions ("Gov't Mem."), Docket Entry No. 99.) For the reasons set forth below, Defendant's motion is denied in its entirety.

## BACKGROUND

### I. The Indictment

Several companies are connected to the fraudulent schemes charged in the Indictment, including, among others, Harbor Funding Group, Inc. ("HFGI"), a company that was in the business of providing financing for real estate development projects, and Black Sand Mine, Inc.

("BSMI"), a company that purportedly owned a large stake of a mining operation. (Indictment ¶¶ 1, 4.) Defendant purportedly was part of HFGI's management team and was employed by BSMI. (*Id.*)

Count One of the Indictment alleges a fraudulent advance fee scheme involving HFGI. Specifically, the Indictment charges that Defendant and others offered loans through HFGI to land developers building in regions affected by Hurricane Katrina in exchange for a ten percent advance fee that would be placed in escrow and refunded if HFGI did not fund the project. (*Id.* ¶¶ 5-6.) However, HFGI allegedly lacked funds to provide financing for any such projects, the ten percent fees were transferred almost immediately from the escrow account to accounts controlled by co-defendant William Lange, and the fees were never refunded even though HFGI did not fund the projects. (*Id.* ¶ 6.) Defendant and others allegedly made false and material misrepresentations to land developers and clients in connection with the scheme. (*Id.* ¶ 12.) Additionally, Defendant and others allegedly used more than $9 million collected in the form of advance fee payments to funnel money to other businesses owned or controlled by co-defendants William Lange and Joseph Pascua and to pay employees' salaries and co-defendant William Lange's vacations, mortgage payments, and personal expenses. (*Id.* ¶ 7.)

Counts Two and Three address a fraudulent scheme involving BSMI. Specifically, Defendant and his coconspirators are charged with making false and material misrepresentations concerning BSMI to induce investors to invest thousands of dollars in the company. (*Id.* ¶¶ 8-10.) Those false misrepresentations allegedly included statements that HFGI had lent BSMI $900,000, BSMI had $850,000 available in total assets, and the investors' money would be used to pay expenses for fuel, food, transportation, labor, and insurance. (*Id.* ¶ 9.) Contrary to these representations, most of the funds invested in BSMI purportedly were distributed among

Defendant and his coconspirators. (*Id.* ¶ 10.)

## II. Defendant's Grand Jury Appearance

The following facts apparently are undisputed. Sometime in 2011, two FBI agents visited Defendant at his residence in Washington State. (Def. Mem. at 1; Gov't Mem. at 5.) The agents indicated that they were investigating matters related to William Lange and asked if Defendant would speak to them. (Def. Mem. at 1; Gov't Mem. at 5.) The agents added that speaking with them probably would obviate the need for Defendant to appear in New York to speak with representatives at the U.S. Attorney's Office or to testify in grand jury proceedings. (Def. Mem. at 1.) Defendant spoke with the agents for twenty to thirty minutes. (*Id.*)

Shortly thereafter, the agents returned to Defendant's residence and served Defendant with a subpoena to testify before a grand jury empaneled in the Eastern District of New York (the "grand jury"). (Def. Mem. at 1; Gov't Mem. at 5.) However, the agents neither provided Defendant with a target letter or advice of rights form, nor told Defendant he was a target of the investigation or gave him any warning concerning his Fifth Amendment rights. (Def. Mem. at 1-2.)

On April 6, 2011, Defendant testified before the grand jury concerning his involvement with and knowledge of HFGI and BSMI. After being sworn, the prosecutor advised Defendant that: (1) the grand jury was investigating allegations regarding criminal conduct involving violations of federal law; (2) he may refuse to answer any question, if he believed that a truthful answer would tend to incriminate him; and (3) anything he said could be used against him by a grand jury or in a subsequent legal proceeding. (Grand Jury Transcript ("Tr.") at 3, Docket Entry No. 110.) Defendant stated he understood these warnings and confirmed that he had not been threatened or coerced to testify in a particular way and was not represented by counsel. (*Id.*

at 3-4.) However, the prosecutor did not inform Defendant that he was a target of the investigation or of his right to consult an attorney prior to or during the grand jury testimony. The relevant portion of Defendant's grand jury testimony reads as follows:

> Q. Mr. Russell, before we start, I'd just like to give you some general warnings and some questions regarding whether you'll be able to answer the questions truthfully, okay? First, the grand jury is investigating some allegations regarding criminal conduct involving violations of federal law. I will ask questions of you, and the court reporter who's over here is recording those questions and answers. You may refuse to answer any question if you believe that a truthful answer will tend to incriminate you. Anything that you say may be used against you by the grand jury or in a subsequent legal proceeding. Do you understand all of what I just said?
>
> A. Yes.
>
> . . .
>
> Q. Has anyone made any promises to get you to testify in a particular way here today?
>
> A. No.
>
> Q. Has anyone threatened or coerced you to get you to testify in a particular way here today?
>
> A. No.
>
> Q. Is there any reason why you would be unable to provide complete and truthful testimony before the grand jury?
>
> A. No.
>
> Q. Are you represented by counsel?
>
> A. No.
>
> Q. I want to remind you that you are testifying under penalty of perjury, and that you have been sworn by the foreperson for that purpose. Do you understand that?
>
> A. Yes.
>
> Q. And if you answer a question untruthfully or deliberately mislead the grand jury, you could be prosecuted for a felony of perjury. Do you understand that?

A. Yes.

Q. Also, if you were to answer a question with the answer of something like "I don't recall," or "I don't remember," or "I don't know" when you actually do recall, do remember or do know the answer, then that can also constitute perjury. Do you understand that?

A. Yes.

Q. Is there anything about the above instructions that you don't understand?

A. No.

(*Id.* at 3-5.)

On November 21, 2011, approximately seven and a half months after Defendant testified before the grand jury, the grand jury returned a Superseding Indictment charging William Lange, Frank Perkins, Kristofor Lange, and Defendant with wire and securities fraud offenses in connection with their involvement with HFGI and BSMI. On September 10, 2012, Defendant moved to dismiss the Indictment, or alternatively, to suppress his grand jury testimony.

## **DISCUSSION**

Defendant, who contends that he was a target or subject of the government's investigation at the time he testified before the grand jury, argues that the Indictment should be dismissed, or alternatively, his grand jury testimony suppressed, because he did not receive "comprehensive warnings" concerning his Fifth Amendment rights. (Def. Mem. at 5-8.) Despite conceding that the Supreme Court has not yet decided whether *Miranda*-like warnings are necessary for grand jury witnesses, Defendant nonetheless argues that comprehensive warnings are constitutionally required before the target or subject of an inquiry can be deemed to have waived Fifth Amendment privileges. (*Id.* at 7.)

In *Miranda v. Arizona*, the Supreme Court held that, in situations involving "custodial interrogation," warnings must be given "that [a person] has a right to remain silent, that any

5

statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). However, the Supreme Court has never squarely decided whether similar Fifth Amendment warnings are required in the grand jury setting. *See United States v. Washington*, 431 U.S. 181, 186 (1977) ("[T]his Court has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves. Nor have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses . . . .").

In *United States v. Washington*, the Supreme Court held that testimony given by a grand jury witness suspected of wrongdoing could be used against him in a later prosecution for a substantive criminal offense, even though the witness was not informed prior to testifying that he was a "potential defendant" in danger of indictment. 431 U.S. at 186-91. The Court declined to decide whether any warnings were constitutionally required for grand jury witnesses because the comprehensive warnings the respondent in *Washington* received prior to testifying, which included warnings that he had the right to remain silent and to speak with a lawyer prior to and during questioning, plainly were satisfactory. The Court noted:

> After being sworn, respondent was explicitly advised that he had a right to remain silent and that any statements he did make could be used to convict him of crime. It is inconceivable that such a warning would fail to alert him to his right to refuse to answer any question which might incriminate him. This advice also eliminated any possible compulsion to self-incrimination which might otherwise exist. To suggest otherwise is to ignore the record and reality. Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled. Moreover, any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminatory aspects is completely removed by the warnings given here.

*Id.* at 188.

Although it declined to reach the issue in *Washington*, the Supreme Court has suggested

in other opinions and dicta that full *Miranda* warnings may not be required for grand jury witnesses. First, in *United States v. Mandujano*, 425 U.S. 564 (1976), decided approximately one year before *Washington*, the Court concluded that the Fifth Amendment privilege against self-incrimination did not require the suppression of statements made by a grand jury witness in a subsequent prosecution for perjury, even though the witness was a putative defendant and had not been given *Miranda* warnings at the time of his grand jury testimony. In reaching this conclusion in a four-justice plurality opinion, the Court reasoned:

> The [lower] court's analysis, premised upon the prosecutor's failure to give *Miranda* warnings, erroneously applied the standards fashioned by this Court in *Miranda*. Those warnings were aimed at the evils seen by the Court as endemic to police interrogation of a person in custody. *Miranda* addressed extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. The decision expressly rested on the privilege against compulsory self-incrimination; the prescribed warnings sought to negate the "compulsion" thought to be inherent in police station interrogation. But the *Miranda* Court simply did not perceive judicial inquiries and custodial interrogation as equivalents . . . .

*Id.* at 579 (citing *Miranda*, 384 U.S. at 461) (internal footnotes omitted). The plurality also recognized that "official investigations, such as grand jury questioning, take place in a setting wholly different from custodial police interrogation," and further, "[t]o extend these concepts [of police coercion] to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda* . . . ." *Id.* at 579-80. However, because the grand jury witness in *Mandujano* had been warned prior to testifying that he could refuse to answer incriminating questions and consult with a lawyer during the questioning, the Court found it "unnecessary to consider whether any warning is required." *Id.* at 567-68, 581-82.

Second, in *Minnesota v. Murphy*, 465 U.S. 420 (1984), the Supreme Court held that statements made by a probationer to his probation officer without prior *Miranda*-like warnings

7

were admissible against the probationer in a subsequent criminal proceeding. In declining to afford the probationer *Miranda*-like protections, the Court compared the probationer's circumstances to that of a grand jury witness and reasoned as follows:

> We note first that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege. . . . [W]e have never held that [warnings] must be given to grand jury witnesses, . . . and we decline to require them here since the totality of the circumstances is not such as to overbear a probationer's free will.

*Id.* at 427, 431 (citations omitted).

The Second Circuit also has not squarely addressed whether *Miranda*-like warnings are required under the Fifth Amendment for target or subject witnesses testifying in grand jury proceedings. District courts within the Second Circuit have suggested that such warnings are not required. *See United States v. Fish*, 2006 WL 3731292, at *9 (W.D.N.Y. Dec. 18, 2006) ("[P]ursuant to [the U.S. Supreme Court's holding in *Mandujano*] the prosecutor was not required to give full *Miranda* warnings before [defendant's grand] jury testimony."); *United States v. Matos*, 990 F. Supp. 141, 145 (E.D.N.Y. 1998) ("I agree with two prominent commentators' assertion that, if the Supreme Court addresses the issue head-on, it will hold that the Constitution does not require the administration of warnings to testifying targets in the grand jury, . . . even though warnings might serve to dissipate a grand jury witness' misimpression that he must answer incriminating questions truthfully.") (citation omitted).

Other circuits that addressed the issue have concluded that *Miranda*-like warnings are not required in light of the Supreme Court's decisions in *Washington*, *Mandujano*, and *Murphy*. For instance, in *United States v. Gomez*, 237 F.3d 238 (3d Cir. 2000), the Third Circuit found that the

8

district court properly refused to suppress the defendant's grand jury testimony, despite the government's failure to fully advise the defendant of his Fifth Amendment right against self-incrimination. In affirming the defendant's conviction for health care fraud, the court concluded that the government "did not have a constitutionally mandated obligation to advise [the defendant] that he could remain silent and that anything he said could be used against him" in grand jury proceedings. *Id.* at 241.

Consistent with *Gomez*, other circuits have resisted finding *Miranda*-like warnings required for witnesses appearing before the grand jury. *United States v. Paige*, 241 F. App'x. 620, 622 (11th Cir. 2007) (concluding that the district court did not err in refusing to suppress defendant's grand jury testimony where defendant "was not read his *Miranda* rights before he testified"); *United States v. Myers*, 123 F.3d 350, 361 (6th Cir. 1997) ("The few circuits that have addressed this issue have likewise been hesitant to require as a matter of constitutional law *Miranda*-like warnings to suspects appearing before the grand jury."); *United States v. Gillespie*, 974 F.2d 796, 804 (7th Cir. 1992) ("Courts confronting this issue have uniformly suggested that any *Miranda*-type warnings that may be applicable in the grand jury context are minimal at best."); *Labbe v. Berman*, 621 F.2d 26, 29 (1st Cir. 1980) (holding that *Miranda* warnings were not required for suspect testifying at inquest when suspect's lawyer had previously advised him of his privilege against self-incrimination).

Here, the prosecutor warned Defendant that: (1) the grand jury was investigating criminal conduct involving violations of federal law; (2) he may refuse to answer any question, if he believed a truthful answer would incriminate him; and (3) his testimony could be used against him by the grand jury or in a subsequent legal proceeding. (Tr. at 3.) Moreover, the government specifically warned Defendant that providing false answers could result in his prosecution for

9

perjury and asked Defendant if he was represented by counsel. (*Id.* at 4-5.)  As the Supreme Court noted in *Washington*, in these circumstances, "[i]t is inconceivable that such a warning would fail to alert [Defendant] to his right to refuse to answer any question which might incriminate him."  431 U.S. at 188.  Given the reluctance of federal courts, including the Supreme Court, to require *Miranda*-like warnings as a matter of federal constitutional law, the warnings here were sufficient to advise Defendant of his Fifth Amendment rights.

Although the prosecutor asked Defendant if he had legal counsel prior to questioning Defendant about potential criminal activity, Defendant contends that the prosecutor's failure to advise him of his right to speak with counsel before or during his grand jury testimony also violated his Fifth Amendment rights.  (Def. Mem. at 8.)  However, Defendant has cited no authority suggesting that there is anything inherently coercive about the grand jury setting that would trigger the right to this warning.  As the Supreme Court has confirmed, in the context of *custodial interrogations*, "[t]he right to counsel mandated by *Miranda* was fashioned to secure the suspect's Fifth Amendment privilege in a setting thought inherently coercive."  *Mandujano*, 425 U.S. at 581 n.6; *see also Alexander v. Connecticut*, 917 F.2d 747, 751 (2d Cir. 1990) ("It is the fifth amendment's prohibition against compelled self-incrimination which provides the constitutional underpinning for the prophylactic *Miranda* rules, including notice of the right to counsel.  Absent a police dominated interrogation, the fifth amendment right to counsel does not attach.").  Nor does Defendant make any sworn allegations of fact to suggest that he was coerced prior to or during his grand jury testimony.  To the contrary, Defendant testified that he was not threatened or coerced to testify at the grand jury proceedings in a particular way.  (Tr. at 4.)

Based on the foregoing analysis, the Court finds that there was no violation of Defendant's constitutional rights in connection with his grand jury testimony.  Accordingly,

Defendant's motion for suppression of his grand jury testimony and dismissal of the Indictment is denied.

Even assuming, *arguendo*, that Defendant's testimony was compelled in violation of his Fifth Amendment right against self-incrimination, dismissal of the Indictment is not warranted. "It is fundamental in our system of criminal justice that 'an indictment returned by a properly constituted grand jury is not subject to challenge on the grounds that it was based on unconstitutionally obtained evidence.'" *United States v. Rivieccio*, 919 F.2d 812, 816 (2d Cir. 1990) (quoting *Washington*, 431 U.S. at 185 n.3). Accordingly, "a violation of . . . the privilege against self-incrimination . . . requires only the suppression at trial of a defendant's compelled testimony." *Rivieccio*, 919 F.2d at 816; *see also United States v. James*, 493 F.2d 323, 326-27 (2d Cir. 1974) ("An indictment, valid on its face, is not rendered invalid merely because evidence otherwise inadmissible was presented to the Grand Jury, . . . even if, as the Supreme Court has several times said by way of dictum, such evidence was obtained in violation of the Fifth Amendment rights of the accused.") (citation omitted). Although the Second Circuit has noted that a narrow exception to this rule applies when the "indictment rests almost exclusively on tainted evidence," *Rivieccio*, 919 F.2d at 816 n.4, Defendant's motion papers present no such argument. Indeed, the government contends that, in addition to Defendant's grand jury testimony, the government obtained incriminating evidence concerning the operations of HFGI and BSMI during the months between Defendant's grand jury testimony and his indictment. (Gov't Mem. at 13.) Accordingly, Defendant's request for dismissal of the Indictment is denied.

Defendant, relying on *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976), alternatively argues that the Court should use its supervisory powers to suppress Defendant's testimony because the government acted contrary to the Department of Justice ("DOJ") policies set forth in

the United States Attorneys' Manual ("USAM").  Specifically, Defendant continues to contend, despite the government's statements to the contrary, that he was a target of the government's investigation prior to the time of his grand jury testimony and, therefore, pursuant to the USAM and DOJ policy, should have received certain warnings and an advice of rights form prior to testifying.  Given the timing of the filing of the initial Indictment and Superseding Indictment, the Court is inclined to give credence to the government's assertion that Defendant was not a target of the investigation at the time he testified before the grand jury, and Defendant's speculative arguments and bald assertions are insufficient to contradict the government's position.

Nonetheless, the Court finds it unnecessary to determine whether Defendant was a target at the time of his testimony because Defendant has offered no basis for the court to exercise its supervisory powers.  Indeed, in support of his request for suppression, Defendant offers only speculative hearsay concerning a supposed lack of uniformity of practice by prosecutors in this district with respect to grand jury witnesses.  (*See* Branden Decl. ¶ 7.)  This is insufficient, particularly after *Jacobs*, as the Court's ability to exercise its supervisory powers is limited.  *See United States v. Williams*, 504 U.S. 36, 50 (1992) ("[A]ny power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings.").  Accordingly, Defendant's reliance on any purported violations of the USAM is unavailing.  *See United States v. Valentine*, 820 F.2d 565, 572 (2d Cir. 1987) (finding defendant was not entitled to suppression of grand jury testimony pursuant to supervisory power for government's non-compliance with DOJ policy); *see also United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir. 1995) ("[T]he U.S. Attorney's Manual is not intended to, does not, and may not be relied upon to create any rights, substantive

or procedural, enforceable at law by any party in any matter civil or criminal.") (internal quotations and citations omitted).[1]

Accordingly, the court declines defendant's invitation to exercise its supervisory powers to suppress defendant's grand jury testimony.

## **CONCLUSION**

For the reasons set forth above, Defendant's motion is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
January 7, 2013

/s/
DORA L. IRIZARRY
United States District Judge

---

[1] While the Court has found no constitutional violation here, clearly the better grand jury practice is set forth in the USAM. In the future, members of the U.S. Attorney's Office are well advised to adhere to DOJ policies as reflected in the USAM, particularly with respect to the rights of witnesses, victims, and defendants.